Curia, per
Richardson, J.
Does the displacing of a buoy, by some supposed natural cause, ten or fifteen days before the Harvest was stranded, constitute one of those perils that come within the proper meaning of the exceptions to the liability of common carriers, which áre balled *206 “acts of God,” or unavoidable perils of the sea? Such is the question for this Court.
In all cases of loss, an obligation of a safe delivery of the goods intrusted to him being necessarily imposed upon the carrier, he must bear the loss; unless he can shew that it was caused by an inevitable casualty, i e, by the act of God. This is laid down, not only by the best jurists, see Story’s Bailments, 339, 2 Kent 597, but is recognized in our own courts. See Ewart vs. Street, 2 Bail. 157, Smith vs. Niolon, 2 Bail. 421, and many other cases.
The act of God is commonly illustrated by such natural convulsions as tempests, lightning, earthquakes, the unknown shifting of shoals, and the like.
In Forward vs. Pittard, 1 T. R. 33, the Court said, “ the act of God meant something in opposition to the act of man;” and the general characteristics of such perils are very intelligible.
It is vain to arraign the principles that impose sueh strict accountability upon common carriers.
It is nearly the same upon Inn keepers, owners of ferries, and keepers of livery stables, and for similar reasons. The goods delivered to a carrier, the guest and his baggage at an inn, the horse at a public stable, and especially the first, are all placed within the custody and exclusive control of these depositaries respectively. And the customer or freighter, being generally strangers to the inn keeper or carrier, justifies the strong expression, that in such cases, “ distrust is the sinew of wisdom.” 1 T. R. 27. Story, 319.
This strict accountability of common carriers, has been found necessary in all commercial communities, and has been the same for centuries. Story, 319. 2 Kent, 502. It is established, says Judge Story, for the safety of all persons who are obliged to trust such persons. J might add, that a successful carrying trade depends upon it. And the very rare exceptions to the rule, made by private contract, and which is so easily required by the carriel', prove the wisdom, the necessity, and the convenience of this strict law. Thus, then, it is adopted almost universally in practice, when it might be avoided by contract, between the carrier and freighter.
Now then carriers, being so liable prima facie to all *207 losses, has the defendant brought himself within the allowed exception 1
The act of God, when set up as an excuse, must be the immediate, not the remote, cause of the loss. In the latter sense, any occurrence or loss may be called the act of God. Abbott on Ship. ch. 4, sec. 5 & 6. Story, sec. 515.
In the case before the court, the buoy had shifted its position, ten or fifteen days before. This is what led captain Thomas astray, and it constitutes the sum of the defence.
But it had often shifted its position before this occurrence ; and such evidence proves the character and nature of buoys. They are not like promonteries, or head lands, <fce. immovable in their nature.
They are important, but both secondary and artificial marks to steer by, and neither natural, nor immovable by ordinary human means.
Can then the not unusual occurrence of the shifting of such a mark of the channel be called, with any propriety, the immediate act of God, causing the stranding of the Harvest'?
The channel remained as before, and all the natural indications of it. Likewise can the shifting of this one means of ascertaining it, be said to have caused the stranding, and to have rendered it inevitable'?
Is there any thing inevitable by human means, either in the shifting of the buoy, or the stranding imputed to such shifting'? Neither can be admitted. For the buoy might have been moved readily by human means. It often shifted, and was often actually so replaced; and great human caution might have navigated the channel without the buoy, or carried the schooner up the ship channel.
The court say, in the case of the carrier vessel, from Selby to Hull, Harper vs. Corbet, 2d Bing. 205, Story, 333, the owners are liable for every injury that might have been prevented by human foresight; and, assuredly, the same accountability applies to the case of the Harvest. Is there any thing in the shifting of the buoy proximate and imme-. diately causing unavoidable loss'? On the contrary, has it, more than a remote bearing upon the loss, or such as may *208 excuse the captain personally % Take the nearest analogous cases for illustration. Two vessels come into collision, in a dense fog; here the fog is the immediate, natural, and unavoidable cause of the collision.
A shoal unexpectedly changes its bed, and a ship grounds upon it. Here the unknown shoal is the immediate and sole cause of the stranding.
The same may be justly said of unknown snags, or sawyers in the river navigation.
In all such cases, the cause of the loss is unseen and unavoidable, and a blow is struck against which the power of man cannot guard the vessel. Such are the blows that are within the inevitable perils of the sea, and which “have too familiarly,” says Judge Story, “been called the acts of God, in contradistinction to human acts;” but such terms are used in order to give an intelligible conception of the intended distinction between the acts that protect the carrier, and such as do not. The terms have been fully expounded, and the legal meaning constitutes the distinguishing mark of this species of bailment.
It is difficult in many cases, to lay down the plain line of demarkation, especially where, as in this case, the carrier has a reasonable excuse for his not using great sagacity, and great human exertion. The captain was probably surprized upon discovering where the buoy floated, and at his own mistake in being altogether governed by it. But human pains might have guarded against such surprize and mistake.
He might have suspected the removal of the buoy, and not gone on relying upon it, as far as he did, and then when it was too late, discovering that he was in shallow water, change his course. Great sagacity, and human caution, might have done so before.
It appears to my understanding, that if ever this court permits the reversal or shifting of such a mere artificial and moveable mark of the proper channel to be classed among inevitable perils, or acts of God, that cause and excuse the stranding and protect the carrier, then we break down the politic establishment of the law against common carriers, and give beginning to the application to them of quite another species of bailments; that of carrying for hire, by pri *209 vate conveyance, and not as common carriers , and which bailment is noticed by the best writers. Such persons are mere bailees for hire, and incur the responsibility of ordinary diligence, Story, 332; 2 Kent, 597 ; but are not like common carriers, insurers against all but the excepted perils. Story, 319.
It is by confounding the plain distinction between these and common carriers, that we hear of going against common carriers, by enforcing the strict doctrine in one district, and protecting them in another, in the latter instance by assuming a supposed more generous and rational conception of the law of carriers, not perceiving that they would apply a well known species of bailment; but inapplicable to common carriers. Because, the strict accountability of common carriers and ferrymen, as well as that of innkeepers, has been fully recognized in our own courts. The cases may be seen at a glance from Rice’s Digest, title “Common Carrier.”
This court, therefore, concurs with the presiding Judge, in applying the settled doctrine of the accountability of common carriers, to the loss of the Harvest; and a new trial is ordered.
O’Neall and Butler, JJ. concurred.